IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAURICE EUGENE SMITH,<br><br>*Defendant.* | Case No. 1:24-MJ-485<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, Christian T. Roccia, Special Agent with the Federal Bureau of Investigation (FBI), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been so employed since 2007. My principal duties include the investigation of criminal allegations of government fraud, bribery and corruption involving public officials, violations of campaign finance law, and mail and wire fraud. I have training and experience in the enforcement of the laws of the United States, including the preparation and presentation of search warrant affidavits and in conducting search warrants. As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

2. I make this affidavit in support of a criminal complaint and arrest warrant charging MAURICE EUGENE SMITH ("**SMITH**") with one count of wire fraud, in violation of 18 U.S.C. § 1343. **SMITH** is a resident of Atlanta, Georgia, and is the owner and operator of a company called EUGENE TORIKO LLC that holds itself out as being in the luxury travel business.

1

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge regarding this investigation. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other officers and agents involved. All other observations were relayed to me or to law enforcement by the persons who made such observations. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Unless specifically indicated otherwise, all dates set forth below are on or about the dates indicated, and all amounts or sums are approximate.

## SUMMARY OF PROBABLE CAUSE

4. In or around August 2024, George Mason University ("GMU"), a public university located in the Eastern District of Virginia, announced the last-minute cancellation of GMU's men's basketball team's foreign tour scheduled for the previous week in the Bahamas. GMU's fundraising arm, the George Mason University Foundation ("GMUF"), had paid more than $150,000 to a sports event marketing group ("COMPANY A") and to **SMITH**, the owner of EUGENE TORIKO LLC, to organize the foreign tour and make reservations for travel and accommodations.

5. The basketball team's players, coaches, staff, and supporters who believed they had reservations for the trip to the Bahamas did not learn that reservations were not made for them until hours before the scheduled departure. Though COMPANY A took full responsibility for the tour's last-minute cancellation, as detailed in a statement posted on its website, COMPANY A did not provide GMU or GMUF with a refund or an explanation for the cancellation other than "unforeseen circumstances."

6. The FBI initiated an investigation soon thereafter based on allegations that GMU and GMUF may have been defrauded. As further described below, the investigation to date has shown that **SMITH** orchestrated a type of Ponzi scheme, whereby he defrauded individuals who paid him

2

and EUGENE TORIKO LLC for travel services that he never provided. Instead, **SMITH** utilized the money that he received for services to enrich himself and to pay back earlier victims of the fraud scheme.

7. Based on a review of subpoenaed bank records, emails, text messages, and other documents, information gleaned from witness, victim and subject interviews, as well as publicly available information, law enforcement learned that **SMITH** markets EUGENE TORIKO LLC's travel services on websites and social media sites, as well as to friends and acquaintances. After finding travel customers, **SMITH** agrees to book travel for those customers in exchange for an agreed upon fee, which is paid by the customer in advance of the travel. **SMITH** sends emails to each of the customers detailing the travel services he was to provide for them. **SMITH** receives payments from the customers but does not book travel for the customer. Instead, he uses the victims' money to pay for his personal expenses, his personal travel, and to repay some victims who eventually learn, usually at the last minute, that no travel reservations were ever made for their trips. Other victims dispute their credit card charges paid to EUGENE TORIKO LLC to recover their losses. It appears the scheme began in at least 2022.

## PROBABLE CAUSE

Fraud on George Mason University / GMU Foundation

8. In or around June 2023, representatives from GMU's men's basketball team began discussions with COMPANY A about organizing a foreign trip for the team the following summer. COMPANY A's owner, "Individual 1," knew **SMITH** through a mutual acquaintance, and contacted **SMITH** about making the travel arrangements for the basketball team to travel to the Bahamas in August 2024 through EUGENE TORIKO LLC.

9. On or about September 25, 2023, **SMITH** emailed Individual 1 an estimated cost for the trip, which included transportation, hotel accommodations, activities, and some meals for 30 people. The estimated cost **SMITH** provided Individual 1 was $149,542.40.

10. In and around early 2024, Individual 1 and **SMITH** worked together to create a detailed draft itinerary and cost estimate for a five-day trip to Nassau, Bahamas, which Individual 1 would present to GMU. On February 26, 2024, **SMITH** emailed Individual 1 another draft invoice for the GMU men's basketball trip which totaled $164,336. In the email, **SMITH** wrote, "We did spread the cushion out." By "cushion" I believe SMITH was referring to not only surprise costs but also profit for COMPANY A and EUGENE TORIKO LLC. Following is an image of that invoice, which included pricing for all transportation, lodging, a private catamaran tour, some meals, and fees associated with basketball games:



11.     Individual 1 and representatives from GMU continued to discuss the trip over email and virtual meetings.  Individual 1 frequently relayed information that **SMITH** provided to him about the trip's cost and itinerary to GMU.  Additionally, emails between Individual 1 and **SMITH** indicate that **SMITH** reviewed and edited the contract that COMPANY A provided to GMU. **SMITH** even lowered the proposed cost of the trip proposed to GMU to $159,756.

12.     On or about April 3, 2024, representatives from GMU, GMUF, and COMPANY A digitally signed a contract related to GMU's men's basketball team's trip to the Bahamas, which

was scheduled for August 8 through August 12, 2024. Although EUGENE TORIKO LLC was supposed to handle all travel arrangements—and **SMITH** himself reviewed and edited the contract—neither **SMITH** nor EUGENE TORIKO LLC were mentioned in the contract.

13. Per the contract, COMPANY A was to provide the following, although COMPANY A was relying on EUGENE TORIKO LLC for most of these services:

   a. "round trip airfare for traveling parties through a direct flight from Fairfax, VA to Nassau, Bahamas;

   b. ground transportation by charter bus during the Foreign Tour including from and to the Bahamas airport, games, experiences, tournament-provided practices and hotel;

   c. hotel stays with double occupancy; single occupancy where indicated;

   d. daily breakfast at hotel and lunch on tournament days;

   e. sightseeing to a minimum of two (2) destinations;

   f. two (2) games to be played in the Bahamas;

   g. operational services fee (court rental, etc.)

   h. sanctioning fees on behalf of School with USA basketball and foreign basketball federations; and,

   i. a [COMPANY A] escort to accompany the School during duration of the tour."

14. The signed contract also included the following schedule:





15.     On April 17, 2024, GMUF wired a $55,914.60 deposit to COMPANY A's bank account. On April 19, 2024, **SMITH** emailed Individual 1 the invoice shown below for "the upcoming summer tour for GMU Men's Basketball." The invoice detailed the services EUGENE TORIKO LLC was to provide on behalf of COMPANY A for GMU and GMUF, and the cost for those services.



16.     On April 24, 2024, using the funds received from GMUF, COMPANY A wired $40,800 to EUGENE TORIKO LLC's JP Morgan Chase bank account ending 8710 ("JPMC 8710"), the amount listed above as "deposit."

17.     On May 20, 2024, a representative from GMU sent an email to Individual 1 asking Individual 1 to send GMU an invoice for the next deposit that was due on May 27.  Soon thereafter, Individual 1 and **SMITH** exchanged the following text messages:

Individual 1:   Hey mo, don't forget the invoice[.] I have to get this to them today.

8

**SMITH**: Ok sending shortly . . . Sent

At approximately 4:34 p.m. on May 20, **SMITH** emailed Individual 1 the following invoice:



18.     Individual 1 then confirmed receipt of the invoice by texting **SMITH**, "So they owe $103841…Includes the left over cushion correct? Just want to make sure before I send it over…"

9

19. Individual 1 (who was in the state of Georgia) then emailed the representative from GMU (in the Eastern District of Virginia) the following invoice, using the information that **SMITH** provided:



20. The email containing this invoice—which **SMITH** caused Individual 1 to send—is the basis for the count of wire fraud listed in the criminal complaint.

21. At approximately 5:50 pm, the GMU representative emailed Individual 1 in response, "Thank you. I just submitted it to [GMUF] for payment."

22. On May 23, 2024, GMUF wired the balance of $103,841 to COMPANY A's bank account. Bank records list the "wire initiator information" as GMUF, at an address in the Eastern

District of Virginia. Using the funds received from GMUF, COMPANY A paid EUGENE TORIKO LLC $57,736.07 on May 29, 2024, and the remaining balance of $11,220 on June 10, 2024. The payments were deposited into JPMC 8710.

23. All total, COMPANY A paid EUGENE TORIKO LLC the entire amount of the above invoice, $109,756.07, using funds paid by GMUF. Additional family members, friends, and supporters of the GMU men's basketball student-athletes also paid COMPANY A and EUGENE TORIKO LLC to accompany the team on their trip to the Bahamas. Those payments, as well as other tour-related expenses, are not reflected in this analysis.

24. Through interviews and a review of subpoenaed records, law enforcement learned that on May 10, 2024, **SMITH** reserved 30 seats for "[GMU] MENS BASKETBALL" on roundtrip flights between Ronald Reagan National Airport in Arlington, Virginia, and Nassau International Airport in the Bahamas. **SMITH** was to pay a $3,000 deposit no later than May 24, 2024, with the balance due by July 9, 2024. Records indicate **SMITH** reserved a block of rooms for the GMU men's basketball team at the Grand Hyatt Baha Mar in the Bahamas sometime in early 2024.

25. Although EUGENE TORIKO LLC received $109,756.07 from COMPANY A to pay for this trip to the Bahamas, **SMITH** spent zero dollars to pay for and secure those reservations. When American Airlines never received the initial $3,000 deposit due to reserve the flights, the reservations were canceled. The Grand Hyatt Baha Mar was never paid for the reserved block of rooms. Further, a review of **SMITH**'s and EUGENE TORIKO LLC's bank records showed no payments made to any catamaran companies in the Bahamas between January and September 2024, or payments to any Bahamian companies during that same timeframe.

26. Although **SMITH** never paid for the airline tickets or hotel rooms, he continued to exchange numerous emails and text messages with Individual 1 as if he had. **SMITH** and Individual 1 communicated about flights, frequent flier numbers, room assignments, resort fees, and other

11

logistics for the trip up until three days before the basketball team was scheduled to depart for the Bahamas in August 2024. Only then did representatives from GMU learn that the trip was suddenly canceled, and they had likely been defrauded.

27. On or about September 11, 2024, **SMITH** sent the following letter via email to GMU through COMPANY A:

> To the Leadership of [COMPANY A] and GMU:
>
> I am personally writing to extend my deepest apologies for the recent issues that occurred with the planned foreign tour for GMU men's basketball team to Nassau, Bahamas. It is with great regret that I acknowledge the logistical error that ultimately led to the cancellation of the tour. This mishap has affected not only the players and staff but also [COMPANY A] as well as many donors and families who were looking forward to this experience.
>
> At Eugene Toriko, we pride ourselves on delivering exceptional service and unforgettable experiences, always striving to uphold our mission of providing meticulously planned and flawlessly executed travel arrangements. Our values of integrity, accountability, and dedication to our clients' needs are at the core of everything we do. We are deeply disheartened that, in this instance, we fell short of these standards.
>
> We fully understand the gravity of this situation and the significant impact it has had on everyone involved. The trust that [COMPANY A] have placed in us is something we value immensely. We are committed to learning from this experience and implementing stricter controls and procedures to prevent any future occurrences. We also recognize the strain this has placed on the relationship between [COMPANY A] and GMU. This is a matter of great concern to us, and we regret any damage this incident may have caused to the trust and partnership you have worked so hard to build.
>
> Once again, please know that we are diligently working to correct the matter and I offer my sincerest apologies for the inconvenience and disappointment this situation has caused. We are dedicated to making things right and ensuring that this remains an isolated incident.
>
> Sincerely Maurice Smith

28. In and around September 2024, FBI agents attempted to interview **SMITH** and serve him with a subpoena for records in his capacity as custodian of records for EUGENE TORIKO

LLC.  **SMITH** refused to meet with the agents in person but agreed to be interviewed over the phone and to accept subpoena service by email.

29. During the telephonic interview, **SMITH** admitted he authored the letter above. Among other things, **SMITH** told the agents that he used an outside agency to reserve the flights for GMU's basketball team and that it was an "oversight" and "miscommunication" that led to him missing the May deposit deadline.  **SMITH** also stated that GMUF would be completely reimbursed by his professional liability insurance company once the insurance company fixed a "glitch."

30. To date, GMUF has not been reimbursed for any payments made to COMPANY A and EUGENE TORIKO LLC.  The "outside agency" **SMITH** claimed to have used to reserve the flights had no record of that claim.  An inquiry to the insurance company revealed that **SMITH** had allowed his professional liability insurance to lapse, so he was not insured at the time.

31. In response to the subpoena, **SMITH** provided seven documents to law enforcement. When I asked if **SMITH** planned to provide additional responsive documents, **SMITH** replied in an email, "No worries!  My apologies, I didn't see your additional email.  Yes if we could please have an extension as there's numerous other documents and emails that we have to send over to you."  That was the last communication between **SMITH** and law enforcement, and the "numerous other documents and emails" were never sent.

Financial Analysis of SMITH's / EUGENE TORIKO LLC's Accounts

32. An FBI forensic accountant analyzed bank statements of several of EUGENE TORIKO LLC's business accounts and **SMITH**'s personal bank accounts, and found no payments made by EUGENE TORIKO for GMU's team's travel.  That was the case even though the payments from GMUF (through COMPANY A) were the only significant deposits into those accounts during that time.

33. However, the analysis revealed **SMITH** did use GMU's funds to pay for his own travel. Travel records indicate **SMITH** traveled to Tulum, Mexico, between approximately May 13 and 16, 2024, just weeks after receiving the first deposit payment from COMPANY A for GMU's trip. Those same records show **SMITH** traveled to Panama City, Panama, between approximately June 2 and 9, 2024, days after receiving another transfer from COMPANY A for GMU's trip. Bank statements from JPMC 8710 show **SMITH** used GMU's money to pay for, among other things, his airfare, hotel accommodations, and/or meals for those trips.

34. As noted above, on April 24, 2024, COMPANY A wired $40,800 of GMUF's money to JPMC 8710. The following day, **SMITH** obtained two cashier's checks drawn on JPMC 8710:

   a. one in the amount of $10,453.39 made payable to a representative of a university that is hereinafter identified as "VICTIM 3"; and

   b. one in the amount of $4,840.53 made payable to an individual hereinafter identified as "VICTIM 4."

35. Additionally, **SMITH** made numerous transfers from JPMC 8710 to his various personal and business accounts at Navy Federal Credit Union (NFCU). In reviewing **SMITH**'s NFCU accounts, law enforcement located a second cashier's check made payable to the representative of VICTIM 3, in the amount of $2,570.

Other Victims of the Fraud Scheme

36. In September 2024, the FBI interviewed a representative from VICTIM 3, a private university located in Waleska, Georgia. In approximately December 2023, VICTIM 3's men's baseball program booked travel to Shreveport, Louisiana for a tournament through EUGENE TORIKO LLC. As of approximately late February 2024, the team had not received any airline confirmations from **SMITH**. When representatives from VICTIM 3 asked **SMITH** about the airline ticketing information, **SMITH** stated he did not know what happened and that there must have been

a misunderstanding. The baseball team was forced to take a bus to Shreveport, Louisiana. VICTIM 3 immediately demanded a refund from **SMITH**, but it was not received until about three or four months later, in approximately April or May 2024. VICTIM 3 provided copies of those refund checks: one was the JPMC cashier's check made payable for $10,453.39, and the second was the NFCU cashier's check for $2,570 described above. **SMITH** used GMUF's funds to repay most of that refund.

37. In October 2024, the FBI interviewed VICTIM 4. VICTIM 4 reported that in September 2022, he used EUGENE TORIKO LLC to book a trip to Saint Lucia for himself and his wife. VICTIM 4 paid for the trip in full by March 2023. Much like the GMU men's basketball team, VICTIM 4 learned just days before he was scheduled to leave for the trip in July 2023 that although he paid EUGENE TORIKO LLC, the company did not pay for plane tickets or hotel rooms for VICTIM 4 and his wife.

38. **SMITH** assured VICTIM 4 over the ensuing months that he would receive a full refund. According to VICTIM 4, he was only repaid by **SMITH** after VICTIM 4 threatened to file a lawsuit against EUGENE TORIKO LLC. After checking his bank records during the interview, VICTIM 4 confirmed he received and deposited into his NFCU account on April 30, 2024, a cashier's check from EUGENE TORIKO in the amount of $4,840.53. That repayment was made by **SMITH** using GMUF's deposit.

39. In October 2024, the FBI interviewed a representative from a college hereinafter identified as VICTIM 5, a public four-year college located in Lawrenceville, Georgia. In early 2024, faculty from VICTIM 5's international studies department hired EUGENE TORIKO LLC to book a summer 2024 overseas trip for faculty and students. The VICTIM 5 faculty and staff who were scheduled to go on the overseas trip did not receive their airline tickets until they were on their way to the airport. It was not until they landed that they learned that EUGENE TORIKO LLC only

15

booked one-way tickets for everyone. The faculty and parents of the students had to pay for their return tickets at the end of their trip. VICTIM 5 ultimately repaid the faculty and parents for the expenses. VICTIM 5 sent a demand letter to EUGENE TORIKO LLC for repayment of approximately $20,000. To date, VICTIM 5 received no response or repayment for their losses.

## CONCLUSION

40. Based on the foregoing, there is probable cause to believe that, on or about May 20, 2024, in the Eastern District of Virginia and elsewhere, the defendant **MAURICE EUGENE SMITH**, for the purpose of executing and in furtherance of the above-described scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly cause to be transmitted in interstate commerce, by means of wire communication, certain writings, signs, signals, pictures, and sounds—to wit, an email from Individual 1 to GMU transmitting an invoice based on information **SMITH** had provided—in violation of Title 18, United States Code §§ 1343 and 2 (Wire Fraud).

41. I therefore request that the Court issue the proposed criminal complaint and associated arrest warrant.

Respectfully submitted,

*Christian T. Roccia*
Special Agent Christian T. Roccia
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on December 9, 2024.

**Lindsey R Vaala** Digitally signed by Lindsey R Vaala
Date: 2024.12.09 15:47:10 -05'00'

Hon. Lindsey R. Vaala
United States Magistrate Judge

16